GEORGE H. MILLER, JR. and MARY P. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 29712-83
United States Tax Court
T.C. Memo 1989-461; 1989 Tax Ct. Memo LEXIS 461; 57 T.C.M. (CCH) 1419; T.C.M. (RIA) 89461; August 28, 1989
*461 Petitioner husband's father owned and operated an insurance agency. The father established a separate bank account (the Special Account) to hide income that was not reflected on the agency's books and not reported on the tax returns. In 1973 and 1974, petitioner-husband withdrew money from the Special Account and did not report this money on his tax returns. Petitioner-husband pleaded guilty to an indictment that he violated sec. 7206(1), I.R.C. 1954, in that he knowingly and willfully filed a false tax return for 1974 omitting substantial amounts of adjusted gross income. Held: (1) Respondent has failed to show by clear and convincing evidence that petitioner-husband has an underpayment due to fraud for 1973. The statute of limitations bars assessment of any deficiency or addition to tax. Sec. 6501(a), I.R.C. 1954. (2) Respondent has shown by clear and convincing evidence (including limited collateral estoppel) that petitioner-husband has an underpayment due to fraud for 1974. The statute of limitations does not bar assessment of any deficiency or addition to tax. Sec. 6501(c)(1), I.R.C. 1954. Addition to tax imposed under sec. 6653(b), I.R.C. 1954. Amount of deficiency *462 determined. John J. O'Toole, for the petitioners. William S. Garofalo and Alfred A. Pierri, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6653(b)[1] (fraud) against petitioners, [2] *463 as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1973
$ 26,440.47
$ 13,220.23
1974
39,864.83
19,932.41 After concessions by respondent, the issues for decision [3] are as follows: (1) Whether the assessment and collection of deficiencies and additions to tax for 1973 and 1974 are barred by the statute of limitations (sec. 6501(a)) or are allowed under the fraud exception (sec. 6501(c)(1)) to the general period of limitations; and (2) If assessment and collection are not barred for 1973 or 1974, then for that year -- (a) whether petitioner-husband received unreported income in the form of compensation; (b) whether petitioner-husband is liable for an addition to tax under section 6653(b); and (c) what is the amount of the deficiency. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners George H. Miller, Jr. (hereinafter sometimes referred to as "George Junior") and Mary P. Miller, husband and wife, resided in Montclair, *464 New Jersey. George H. Miller, Sr. (hereinafter sometimes referred to as "George Senior") was George Junior's father. George Senior owned the George H. Miller Company (hereinafter sometimes referred to as "the Miller Company") from at least 1946 until 1976. The Miller Company sold insurance as an insurance agency. George Senior operated the Miller Company as a sole proprietorship. The Miller Company had an office in East Orange, New Jersey. Later the office was moved to Montclair. Before 1973, George Senior directed the operations of the Miller Company. In August 1973, George Senior moved to Boca Raton, Florida, with his wife, Virginia Miller. Before he moved to Florida in August 1973, George Senior vacationed during the winter months in Florida; while in Florida, he routinely called the Miller Company's office to check on disposition of insurance checks, deposits, and withdrawals. During these vacations, George Senior also routinely and periodically flew back from Florida and visited the office for a day or two at a time. After George Senior moved to Florida in August 1973, he kept in close contact with the office, managing the Miller Company operations by telephone. He *465 also returned to the office on a regular basis of every few weeks or once a month. George Junior was employed by Employer's Insurance of Wausau Co. (hereinafter sometimes referred to as "Wausau") from 1956 until July 1974. Wausau paid compensation to him for 1973 and 1974 in the amounts of $ 14,802.62 and $ 10,188.28, respectively. George Junior's employment with Wausau was terminated because he had failed to devote enough time to his duties at Wausau after George Senior moved to Florida. His failure to devote sufficient time to his duties at Wausau resulted from his increased involvement in the operations of the Miller Company after George Senior moved to Florida. George Junior's compensation at the Miller Company during 1973 and 1974 was determined by George Senior. George Junior reported compensation, as commission income, from the Miller Company of $ 17,702.55 for 1973 and $ 23,281.47 for 1974. In addition to George Junior and George Senior, the Miller Company employed a bookkeeper and a secretary. From about 1957 to 1970, the bookkeeper was Evelyn Rotonda (hereinafter sometimes referred to as "Rotonda"). Another woman succeeded Rotonda, but stayed only about 3-4 months. *466 Patricia Kelly (hereinafter sometimes referred to as "Kelly") was the bookkeeper from 1970 to 1977. Lorraine Stella (hereinafter sometimes referred to as "Stella") was the secretary from 1965 to 1978. In January 1973, George Junior's first wife abandoned him, leaving him with the care of 11 children ranging from 7 to 19 years. This separation ultimately resulted in a divorce, about February 1974. After the breakup of George Junior's marriage, George Senior became aware that George Junior was not capable of managing his own financial affairs. George Senior arranged for Kelly to assume control of George Junior's checking account. She received part of George Junior's salary checks, made deposits into his account, and paid his bills. In September 1974, George Junior married petitioner Mary P. Miller. A few months later, Kelly stopped managing George Junior's finances. By the end of 1974, George Junior was in effect almost managing or running the Miller Company. However, George Senior continued to control the Miller Company. About 1976, George Senior's "mind started to go", as George Junior put it, and George Junior took control of the Miller Company. The Miller Company had two *467 checking accounts from at least 1963 through December 31, 1974. One account was maintained at the National Newark and Essex Bank, East Orange, New Jersey branch (which later changed its name to Midlantic National Bank) and was designated as "the Special Account". George Senior established the Special Account probably in 1960 or earlier. The second checking account is hereinafter sometimes referred to as "the regular account". On or about September 1974, the Miller Company changed the location of the Special Account to a branch in Montclair, New Jersey. During 1973 and 1974, George Junior and George Senior had signatory authority for the Special Account. More than $ 900,000 was deposited in the Special Account in 1973 and 1974 combined. [4] *468 One source of these deposits was insurance premium payments from various construction contractors. The second source of deposits to the Special Account was dividends and premium refunds received by the Miller Company from Wausau and other insurance companies on behalf of certain Miller Company customers who were construction contractors. The Miller Company's procedure with regard to the insurance premium payments for certain of their contractor customers was as follows: The bookkeeper prepared invoices for the construction contractor. The invoice was mailed to the contractor, but not recorded on the Miller Company's books of account in any manner. The invoice included both a commission for the Miller Company and a premium to be paid to the insurance company writing the policy. When the Miller Company *469 received payment from the contractor, the funds were deposited into the Special Account, which was not recorded in the Miller Company books of account. The bookkeeper then tore up the original invoice and prepared a new invoice. The new invoice was identical to the original invoice except that the new invoice was for a smaller amount. The new invoice amount was less than the old invoice amount by about one-half of the total commission earned by the Miller Company as the agent on the policy. This new invoice was not mailed to the contractor but was reported as an account receivable on the Miller Company book of account. The bookkeeper then drew a check on the Special Account in the amount of the new invoice, payable to the Miller Company, and deposited this check in the regular account. The deposited check was then recorded as the collection of the receivable on the Miller Company books of account. A portion of the monies deposited in the regular account was paid to the insurance company for the premium due to it for writing the policy. The remainder of the deposit to the regular account was reported on the tax return [5] *470 as commissions received. None of the funds that were left in the Special Account were included in gross income for tax purposes by the Miller Company or any person or entity associated with the Miller Company. This was so in the 1960's, as well as in the years in issue in the instant case. In addition to premium payments which were deposited into the Special Account, the Miller Company received a number of dividends and premium refunds on behalf of certain customers in 1973 and 1974. These dividends and premium refunds were deposited in the Special Account. During the years in issue, these customers of the Miller Company authorized Wausau and other insurance companies to send all documents, including dividends and premium refunds pertaining to their insurance policies, directly to the Miller Company. Some of these monies deposited in the Special Account were transferred to the regular account and eventually paid to the customers on whose behalf *471 they had been received. The funds not paid to the customers, but left in the Special Account, were not included in the gross income of either the Miller Company or any entity or person associated with the company. The dividends, on policies written by mutual insurance companies and on participating policies written by stock insurance companies, were intended by the insurance companies to go entirely to the insureds. However, the detailed statements showing the dividends were sent to the Miller Company but were not sent to the insureds. As a result, the insureds did not realize that they were entitled to any dividends. Also, when some portion of a dividend remained in the Special Account, this not only resulted in income being hidden from respondent, it also resulted in an increased net premium being paid by the Miller Company's customer. Premiums on many of their insurance policies were based on estimates. As examples, a worker's compensation policy premium was based on an estimate of gross payroll, and an auto insurance policy premium was based on an estimate of the number of vehicles. If the payroll, or number of vehicles, was less than the original estimate, then the premium *472 earned was less than the premium charged. The premium refund was the amount by which the premium charged exceeded the premium earned. Insurance premium payments from construction contractors of the Miller Company which were deposited into the Special Account during 1973 totalled $ 358,285.81. Of that total amount, $ 20,109.23 was left in the Special Account. Dividends and premium refunds received by the Miller Company during 1973 on behalf of certain customers which were deposited into the Special Account totalled $ 68,308.49. Of that total amount, $ 49,964.81 was left in the Special Account. Insurance premium payments from customers of the Miller Company which were deposited into the Special Account during 1974 totalled $ 299,143.60. Of that total amount, $ 25,704.33 was left in the Special Account. Dividends and premium refunds received by the Miller Company during 1974 on behalf of certain customers which were deposited into the Special Account totalled $ 98,440.78. Of that total amount, $ 77,345.87 was left in the Special Account. Thus, over the 2 years, insurance premium payments deposited into the Special Account totalled $ 657,429.41; $ 611,615.85 of this total was either *473 paid to the insurance companies who wrote the insurance or otherwise reflected as income on the Miller Company books of account. The $ 45,813.56 remaining in the Special Account from this source was properly commission income to the Miller Company, part for 1973 and part for 1974, and was not reflected on the Miller Company books of account. Also, over the 2 years, dividends or premium refunds deposited into the Special Account totalled $ 166,749.27. Of this total, $ 39,438.59 was remitted to the customers to whom the dividends or premium refunds belonged. The remaining $ 127,310.68 was not reflected on the Miller Company books of account. During 1973, the 35 checks listed in table 1 were drawn on the Special Account payable either to cash or to George Junior and cashed by George Junior. Table 1 Special Account
Check No.
Date
Amount
Payee
Endorsement
2344
1/08/73
$   500.00 George Junior
George Junior
2394
1/08/73
1,200.00 George Junior
George Junior
2390
1/15/73
600.00 George Junior
George Junior
2385
1/17/73
1,500.00 George Junior
George Junior
2392
1/19/73
2,898.00 George Junior
George Junior
2389
2/16/73
2,800.00 George Junior
George Junior
2419
2/22/73
430.00 George Junior
George Junior
2418
2/22/73
707.00 George Junior
George Junior
2420
2/28/73
143.00 cash
George Junior
2421
2/28/73
1,551.00 George Junior
George Junior
2417
3/10/73
237.00 George Junior
George Junior
2431
3/22/73
500.00 cash
George Junior
2433
4/16/73
883.00 George Junior
George Junior
2432
4/18/73
1,183.00 George Junior
George Junior
2450
5/01/73
219.70 George Junior
illegible
2462
6/11/73
50.00 cash
George Junior
2463
6/18/73
241.00 George Junior
George Junior
2471
7/05/73
3,875.00 George Junior
George Junior
2473
7/09/73
98.00 cash
George Junior
2501
8/27/73
250.00 George Junior
George Junior
2508
9/08/73
200.00 cash
George Junior
2509
9/11/73
3,206.00 George Junior
George Junior
2506
9/11/73
4,000.00 cash
George Junior
2528
10/02/73
500.00 cash
George Junior
2516
10/10/73
670.00 cash
George Junior
2527
10/30/73
281.00 cash
George Junior
2530
11/07/73
3,000.00 cash
George Junior
2529
11/08/73
2,260.00 cash
George Junior
2539
11/30/73
200.00 cash
George Junior
2538
11/30/73
3,000.00 George Junior
George Junior
2537
11/30/73
3,725.00 cash
George Junior
2540
12/05/73
2,560.00 cash
George Junior
2544
12/12/73
187.00 cash
George Junior
2545
12/12/73
625.00 cash
George Junior
2552
12/19/73
125.00 cash
George Junior
Total $ 44,404.70
*474 During 1973, the checks listed in table 2 were drawn on the Special Account payable to George Junior and were deposited into George Junior's personal bank account. Table 2 Special Account
Check No.
Date
Amount
2388
1/15/73
$ 2,025.00
2425
3/15/73
250.00
2443
5/03/73
2,000.00
2445
5/21/73
250.00
2452
6/11/73
300.00
2461
6/29/73
900.00
2470
7/02/73
1,000.00
2564
12/19/73
1,000.00
Total $ 7,725.00
During 1973, the checks listed in table 3 were drawn by George Junior on the Special Account to pay creditors of George Junior. Table 3 Special Account
Check No.
Date
Amount
Payee
2515
10/04/73
$   688.04 Farrell Kerns Oil Co.
2514
10/04/73
338.24 R. S. Oppenheimer, Inc.
2526
10/27/73
845.00 Harry Reese
Total $ 1,871.24
During 1974, the 37 checks listed in table 4 were drawn on the Special Account payable either to cash or to George Junior and cashed by George Junior. Table 4 Special Account
Check No.
Date
Amount
Payee
Endorsement
2541
1/07/74
$ 1,120.00 cash
George Junior
2563
1/10/74
500.00 George Junior
illegible
2549
1/14/74
2,420.00 cash
George Junior
2542
1/28/74
540.00 cash
George Junior
2576
1/31/74
790.00 cash
George Junior
2578
2/06/74
100.00 cash
George Junior
2574
2/27/74
500.00 George Junior
George Junior
2577
3/07/74
690.00 cash
George Junior
2585
3/15/74
200.00 cash
George Junior
2584
3/22/74
424.00 cash
George Junior
2587
3/26/74
500.00 cash
George Junior
2582
4/08/74
250.00 George Junior
George Junior
2595
4/25/74
535.00 cash
George Junior
2613
5/06/74
4,000.00 cash
George Junior
2612
5/07/74
4,430.00 cash
George Junior
2624
5/16/74
43.00 cash
George Junior
2622
6/03/74
4,000.00 cash
illegible
2623
6/03/74
4,300.00 cash
George Junior
2621
6/03/74
3,100.00 cash
George Junior
2625
6/04/74
560.00 cash
illegible
2627
6/04/74
2,680.00 cash
illegible
2628
6/04/74
176.00 cash
George Junior
2630
6/06/74
105.00 cash
George Junior
2626
6/26/74
1,525.00 cash
illegible
2634
7/19/74
395.00 cash
illegible
2642
7/23/74
4,000.00 cash
illegible
2633
7/23/74
4,500.00 cash
illegible
2649
8/06/74
2,570.00 cash
George Junior
2648
8/06/74
3,000.00 cash
George Junior
2650
8/19/74
100.00 cash
George Junior
8  9/11/74
635.00 cash
George Junior
1001
9/25/74
3,900.00 cash
George Junior
1002
9/25/74
1,820.00 cash
George Junior
1003
12/02/74
8,307.00 cash
George Junior
1033
12/09/74
315.00 cash
George Junior
1030
12/10/74
1,000.00 cash
George Junior
1037
12/18/74
3,200.00 cash
George Junior
Total $ 67,230.00
*475 During 1974, the 14 checks listed in table 5 were drawn on the Special Account and were deposited into George Junior's personal account. Twelve of these checks were drawn by George Junior. Table 5 Special Account
Check No.
Date
Amount
Payee
2578
2/06/74
$   900.00 cash
2581
3/21/74
800.00 George Junior
2597
5/01/74
1,000.00 George Junior
2605
6/03/74
1,150.00 George Junior
2606
6/06/74
2,000.00 George Junior
2635
7/15/74
1,000.00 George Junior
2651
8/15/74
300.00 George Junior
2647
8/15/74
3,000.00 George Junior
8  9/12/74
2,000.00 George Junior
1008
10/18/74
1,000.00 George Junior
1017
11/05/74
700.00 George Junior
1018
11/13/74
800.00 George Junior
1026
11/26/74
550.00 George Junior
1032
12/04/74
500.00 George Junior
Total $ 15,700.00
During 1974, the checks listed in table 6 were drawn on the Special Account to pay creditors of George Junior. Table 6 Special Account
Check No.
Date
Amount
Payee
2562
1/03/74
$ 133.95 Peter Walburg
2570
1/09/74
98.38 Alex Frankel
2586
3/21/74
74.25 Myrtle Small
8  9/11/74
83.25 Myrtle Small
Total $ 389.83 Each of the checks shown in table 6 was signed by George Junior. During 1973, George Senior was the maker of 18 checks from the Special Account which he cashed for a total of $ 6,326. During 1973, George Senior *476 was the maker of three checks from the Special Account which he deposited to his personal account for a total of $ 4,300. During 1973, George Senior paid personal expenses with 33 checks from the Special Account for a total of $ 18,671.06. After August 1973, when George Senior was in Florida, he had Special Account checks with him which he cashed. During 1974, George Senior was the maker of eight checks from the Special Account which he cashed for a total of $ 3,550. During 1974, George Senior was the maker of 11 checks from the Special Account which he deposited to his personal account for a total of $ 6,100. During 1974, George Senior paid personal expenses with 14 checks from the Special Account for a total of $ 5,089.73. George Senior wrote checks on the Special Account as gifts to family members. Many of those checks were for $ 50, but some were for as much as $ 500. George Senior instructed Rotonda how to use the dual invoice procedure. George Senior and Rotonda instructed Kelly how to use the dual invoice procedure. Kelly never explained the dual invoice procedure to George Junior. George Junior became a signatory on the Special Account in late 1972; he learned of the *477 Special Account before then. The Special Account bank statements were left in George Senior's desk, even when George Senior was in Florida. Neither Stella, Rotonda, nor Kelly reconciled the Special Account statements. George Junior did not see the Special Account statements in 1973 and 1974. George Junior never gave Stella any instructions nor asked her any questions about the Special Account; nor did he ask her to show him the Special Account statements. It was the common practice of both George Senior and George Junior to pre-sign blank checks on the Special Account and leave them in the office for use by Rotonda and Kelly. George Junior regularly cashed checks for George Senior against the Special Account and returned the cash to George Senior. No gift tax returns were filed with regard to the checks that were drawn on the Special Account. George Senior had Special Account checks with him when he was in Florida; he withdrew funds from this account when he was in Florida. The dual invoice system was in operation from about 1960 until about 1976, when George Junior told Kelly that he and George Senior had agreed that both the dual invoice system and the Special Account were *478 to be discontinued. It was about that time that George Senior's mind began to deteriorate, and George Junior took charge of the Miller Company. On June 27, 1980, George Junior pled guilty to Count 2 of an indictment in the Federal District Court, District of New Jersey, which reads as follows: COUNT 2
That on or about September 3, 1975, in the District of New Jersey, the defendant GEORGE H. MILLER, JR. a resident of Montclair, New Jersey, did knowingly and willfully make and subscribe, and cause to be made and subscribed, a Joint Income Tax Return (Form 1040) for himself and his wife for the calendar year 1974, which was verified by a written declaration that it was made under the penalties of perjury and which was filed with the Internal Revenue Service, which said income tax return he did not believe to be true and correct as to every material matter, in that it was stated on Line 15, Page 1, of the said income tax return that his adjusted gross income was $ 39,469.95, whereas, as the defendant then and there well knew and believed, the adjusted gross income amount for the period reported was substantially greater than the amount heretofore stated. In violation of Title 26, United States Code, Section 7206(1). *479 Count 1 of that indictment charged George Junior with the same crime (violation of sec. 7206(1)) as to his tax return for 1973. Counts 5 and 6 of that indictment charged George Senior with the same crime (violation of sec. 7206(1)) as to George Senior's tax returns for 1973 and 1974. Counts 3 and 4 of that indictment charged George Junior with aiding, etc., George Senior in filing false tax returns for 1973 and 1974 (violation of sec. 7206(2)). On July 28, 1980, a sentencing hearing was conducted by Judge Frederick B. Lacey of the United States District Court for the District of New Jersey. During that hearing George Junior did not offer any explanation for his plea of guilty to Count 2 of the indictment. Judge Lacey suspended imposition of sentence, placed George Junior on probation for 2 years, and required George Junior to perform 5 hours of public service work per week for the 2-year probation period. George Junior did not serve any time in prison and did not pay any fine. All of the five other counts of the indictment were dismissed; that court had previously determined that George Senior was not competent to stand trial. On July 22, 1983, a notice of deficiency for 1973 *480 and 1974 was mailed to George Senior and Virginia Miller, determining deficiencies against both of them and fraud additions to tax against George Senior. George Senior died on June 21, 1983. The estate of George Senior did not file a petition in the Tax Court, and consequently, the tax liabilities determined in the notice of deficiency were assessed by respondent. No part of this liability assessed against George Senior has been paid. Virginia Miller did petition the Tax Court; her case was settled by respondent conceding that she was not liable for deficiencies or additions to tax because she qualified for relief under section 6013(e) (the "innocent spouse" provisions). George Junior filed his 1973 tax return on May 8, 1974. Petitioners filed their 1974 tax return on September 22, 1975. Respondent mailed both of the notices of deficiency with respect to the instant case (one for each year) on July 22, 1983. * * * For 1974, George Junior had an underpayment of income taxes required to be shown on his tax return; some part of this underpayment was due to George Junior's fraud. OPINION I. Statute of Limitations
Petitioners have properly raised in their petition the affirmative *481 defense of the statute of limitations under section 6501(a). Rule 39. [6]
In general, section 6501[7] *482 bars assessment of an income tax deficiency more than 3 years after the date the tax return was filed. If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the filing date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069 (1928). See Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981). In the instant case, petitioners have pled the statute of limitations as an affirmative defense in their petition and have proven that their tax returns for 1973 and 1974 were filed more than 9 years before the notice of deficiency was mailed in the case of their 1973 tax return, and more than 7 years in the case of their 1974 return. Respondent concedes as much. Respondent contends that the instant case falls within the exception to the general period of limitations set forth in section 6501(c)(1) for both 1973 and 1974. [8] *483 The parties agree that, if respondent does not prove that petitioners were fraudulent, then the statute of limitations bars the assessment and collection of any deficiency for 1973 and 1974. [9]
We agree with petitioners as to 1973. We agree with respondent as to 1974. Respondent has the burden of proving the applicability of the exception to the general period of limitations set forth in section 6501(c)(1).[10]Farmers Feed Co. v. Commissioner, supra. This burden is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (CA3 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). To carry this burden *484 for a year, respondent must prove, by clear and convincing evidence, that petitioners have an underpayment of tax for that year, and that some part of that underpayment is due to fraud. Sec. 7454(a); [11] *485 Rule 142(b); e.g., Carter v. Campbell, 264 F.2d 930, 936 (CA5 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). Respondent need not prove the precise amount of the underpayment resulting from the fraud, but only that there is some underpayment and that some part is attributable to fraud. E.g., Lee v. United States, 466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court; [12]Kreps v. Commissioner, 351 F.2d 1, 6 (CA2 1965), affg. 42 T.C. 660 (1964). In carrying his burden, respondent may not rely on petitioners' failure to meet their burden of proving error in respondent's determinations as to the deficiencies (e.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases there cited), [13] *486 but he may rely on deemed admissions. Marshall v. Commissioner, 85 T.C. 267 (1985). See Freedson v. Commissioner, 65 T.C. 333, 335 (1975), affd. 565 F.2d 954 (CA5 1978); Rule 90(f). Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner, 225 F.2d 216, 219-220 (CA6 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954; Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (CA2 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (CA3 1971), *487 affg. Memorandum Opinions of this Court; [14]Otsuki v. Commissioner, 53 T.C. at 108. The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224. In order to establish fraud, respondent must show that the taxpayer intended to evade taxes, which the taxpayer knew or believed he or she owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of the taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [15]Powell v. Granquist, 252 F.2d 56, 60 (CA9 1958); Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence ( Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner, 55 T.C. 85, 92-93 (1970)), including *488 the implausibility of the taxpayer's explanations. Boyett v. Commissioner, 204 F.2d 205, 208 (CA5 1953), affg. a Memorandum Opinion of this Court dated March 14, 1951. Viewing the record as a whole, we conclude that respondent has failed to prove fraud by clear and convincing evidence for 1973. We conclude, and we have found, that respondent has proven fraud by clear and convincing evidence for 1974. It is well established that "gross income means all income from whatever source derived"; at trial respondent made it clear in the following colloquy that his position is that George Junior had received income in the form of compensation, utilizing the mechanism of the withdrawals from the Special Account: [16]
MR. PIERRI: * * * The Government's position with respect to Mr. Miller, Jr. is that monies drawn on the special account were compensation for Mr. Miller and therefore taxable to him. * * * But with respect to Mr. Miller, Jr., * * * our position is that the checks drawn on the special account payable to Mr. Miller, Jr. which he cashed were compensation to him and therefore taxable income to *489 him from the George H. Miller Insurance Company. * * * THE COURT: It's drawn[;] if it goes to him and it is compensation, then it's taxable to him. MR. PIERRI: Well that's our position. THE COURT: Not the matter that if it's drawn to him then it is compensation. MR. PIERRI: Well, our position is that it is compensation to him, Judge. THE COURT: All right. MR. O'TOOLE: May it please the Court? THE COURT: Yes, Mr. O'Toole. MR. O'TOOLE: I have to brief this case; I assume that you will order simultaneous briefs, not seriatums. I have to know what I am -- THE COURT: That's my normal practice. MR. O'TOOLE: -- briefing. * * * THE COURT: All right, Mr. O'Toole, would you sharpen your question to Respondent's counsel and lets [let's] see if we can reach an agreement as to what it is with some greater percision that [precision than] we've gotten up to now, what it is that you are required to prove from the point of view of Respondent. Why don't you ask them which are -- ask them if you wish. * * * MR. O'TOOLE: All right, for purposes of the record I am asking you at this time to define the issue which we have of this case. Is it a [an] issue that this money received by George was compensation? *490 MR. PIERRI: They were payments in the nature of compensation, Your Honor. That's the issue, that's the Government's position in this case. The statutory notice says, "The following represents checks drawn on the special account of George H. Miller Company which were cashed by the taxpayer and the proceeds of such were retained by him." And that's in the nature of compensation to Mr. Miller, Jr. And that's our position, it's never been any different. * * * THE COURT: Forgetting for the moment about whether the statutory notice is clear, what is -- is it Respondent's position that Mr. Miller, Jr. is charged with $ 54,000.98 for 1983 and -- MR. PIERRI: '73, Your Honor. THE COURT: '73. And that Mr. and Mrs. Miller, Jr. are charged with $ 83,319.83 for 1974 as additional compensation for the services of Mr. Miller, Jr. Is that Respondent's position? MR. PIERRI: Yes, Your Honor. * * * MR. O'TOOLE: Yes. I understand that position. THE COURT: Okay. So have we narrowed down the issues? MR. O'TOOLE: That does, yes, Your Honor. Thank you. THE COURT: You may proceed, Mr. O'Toole. MR. O'TOOLE: That's going to cut out at least three pages of my questions. Since the only substantive adjustments *491 (see n.3, supra, relating to the medical expense adjustments) are as to the proper treatment of George Junior's withdrawals from the Special Account, we must determine whether respondent has proven by clear and convincing evidence as to 1973 or 1974 that (1) any of those withdrawals should have been reported by George Junior as compensation and would have given rise to increased tax liability if so reported, and (2) George Junior's failure to report any of the withdrawals in item (1) was due to his tax fraud. Compensation for services, in whatever form received, is includable in gross income. Commissioner v. Duberstein, 363 U.S. 278 (1960); Old Colony Tr. Co. v. Commissioner, 279 U.S. 716 (1929); sec. 61(a)(1). [17] On the other hand, if George Junior merely cashed the checks for George Senior, then George Junior is not taxable on the cashing of the checks, in the context of the instant case, except to the extent that George Senior used the proceeds to compensate George Junior. (See discussions of conduit and other theories in, e.g., Page v. Commissioner, 823 F.2d 1263 (CA8 1987), affg. a Memorandum Opinion of this Court; [18]Diamond v. Commissioner, 56 T.C. 530 (1971), affd. 492 F.2d 286 (CA7 1974).) *492 Also, section 102(a)[19] (which, like section 61, is in subtitle A) provides that the value of property acquired by gift is excludable from gross income. Petitioners maintain that George Junior was merely a conduit; i.e., he cashed the checks when his father told him to do so and then he gave the proceeds to his father. Any proceeds that George Junior retained, petitioners assert, were gifts from George Senior. We agree with petitioners that, in determining whether a transfer is compensation or a gift for *493 purposes of section 102, the most critical consideration is the transferor's intent. For a transfer to constitute a gift in the statutory sense, it must proceed from a "'detached and disinterested generosity,' * * * 'out of affection, respect, admiration, charity or like impulses.'" If, on the other hand, a transfer proceeds primarily from "the constraining force of any moral or legal duty," constitutes a reward for "services rendered," or proceeds from "'the incentive of anticipated benefit' of an economic nature," the transfer is not a gift, but may be compensation. Commissioner v. Duberstein, 363 U.S. at 285. This is a question of fact. Id. at 290. The burden of proof, in the context of the statute of limitations issue, is on respondent. In the instant case, neither side argues that George Junior was the transferor of the funds, i.e., that George Junior intended to pay himself compensation or make a gift to himself. Both sides focus on George Senior as transferor. Determining George Senior's intent has been made more difficult than in the ordinary case as a result of the fact that George Senior died before the instant case was begun and, thus, could not tell us about his intent. *494 During 1973 and 1974, George Junior worked for both Wausau and the Miller Company. Wausau paid him compensation of $ 14,802.62 for 1973 and $ 10,188.28 for 1974. He reported compensation from the Miller Company of $ 17,702.55 for 1973 and $ 23,281.47 for 1974. His employment with Wausau was terminated in August 1974 because he failed to devote enough time to his duties at Wausau after George Senior moved to Florida. The instant case does not involve a situation where a family member performs services for another, receives payments, and claims that all payments were gifts, not compensation for services. George Junior did report compensation for services that he performed at the Miller Company. We must determine whether he received any additional compensation from the Miller Company which he did not report. Respondent has not presented evidence showing the extent to which George Junior provided services for the Miller Company, the value of those services, and whether this value exceeded the amount of compensation George Junior reported from the Miller Company as compensation. The fact that George Senior did not file gift tax returns for 1973 and 1974 does not necessarily prove *495 that what George Junior received were not gifts, because it is unlikely that George Senior would file gift tax returns when he was defrauding the Federal government by his own use of the double invoice procedure and the Special Account from which George Junior obtained the funds. Nor do we consider the fact that the record is void of any evidence that George Senior deducted the checks written against the Special Account by George Junior as compensation on the Miller Company books of account. Deducting these payments as compensation paid might have called attention to the existence of the Special Account and the hidden funds it contained. Respondent has not proven his assertions that the other Miller family members received substantially less in amounts of gifts than George Junior claimed he received from George Senior. The only evidence respondent offered on this point was George Junior's and Kelly's testimony as to the amount of gifts that George Senior gave to the other family members for certain birthdays and holidays. Respondent did not call any other Miller family members to testify as to the amount of gifts that they received from George Senior. On the other hand, we are *496 not persuaded by petitioners' insistence that every dollar of the more than $ 137,000 in dispute in the instant case is accounted for between the gift and conduit theories. George Senior knew how to write checks on the Special Account. Why would he make more than $ 25,000 in gifts to George Junior by directing George Junior to write checks on the Special Account? As to most of the checks that petitioners claim to have been gifts (all of the checks that George Junior deposited into his personal account and all of the checks used to pay George Junior's creditors), there is no evidence of George Senior's intent, donative or otherwise. As to those that George Junior claimed to have cashed at George Senior's direction and then given the proceeds to George Senior, we are faced with the fact that George Senior appears to have cashed checks on the Special Account several times on the same day that George Junior cashed checks on the Special Account. Why would George Senior have used George Junior as a "go-fer" if George Senior was cashing checks the same day? Also, it seems that George Senior cashed many checks on the Special Account while he was in Florida. Why, then, would George Senior *497 simultaneously instruct George Junior to cash checks on the Special Account and hold the proceeds, sometimes for weeks, until George Senior returned from Florida? The record before us for 1973 is equivocal, with neither side's scenario being persuasive. On the record before us for 1973, we cannot find that George Junior received additional compensation. Even if we were to find that George Junior received additional compensation, respondent has not shown by clear and convincing evidence that George Junior's failure to report this compensation was fraudulent for 1973. The evidence in this case clearly indicates that George Senior intended to defraud the government. However, with deference to Shakespeare, the fraud of the father is not the fraud of the son. [20] It is not enough that respondent makes us suspicious of the taxpayer or even proves fraud by a preponderance of the evidence. See Kreps v. Commissioner, 351 F.2d at 7; Shaw v. Commissioner, 27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (CA6 1958); Gano v. Commissioner, 19 B.T.A. 518, 532-533 (1930). "The conscious purpose to defraud proscribed by the statute does not include negligence, carelessness, misunderstanding or unintentional *498 understatement of income." United States v. Pechenik, 236 F.2d 844, 856 (CA3 1956). The evidence must be clear and convincing. In the instant case, the evidence falls short of being clear and convincing for 1973. The circumstances for 1974 do not exactly parallel those for 1973. When 1973 started: George Junior was working at Wausau, his wife had left him, he had to look after their 11 children, Kelly was asked to take over George Junior's finances, and George Senior was on the premises of the Miller Company. By the end of 1974: George Junior was working exclusively at the Miller Company and was generally in charge of day-to-day operations, he was remarried, Kelly was returning control of his finances to him, and George Senior was in Florida much of the time. Also, most importantly, George Junior pled guilty to Count 2 of an indictment for violating section 7206(1). This count stated that George Junior, under penalties of perjury, filed his 1974 income tax return believing it was not true and correct as to every material matter and knowing and believing that his adjusted *499 gross income for 1974 was substantially greater than the $ 39,469.95 he reported for 1974. This guilty plea has collateral estoppel effect which, although limited, is crucial in the instant case. In Wright v. Commissioner, 84 T.C. 636 (1985), we expressly overruled our earlier opinions in Goodwin v. Commissioner, 73 T.C. 215 (1979), and Considine v. Commissioner, 68 T.C. 52 (1977), to the extent that the latter opinions had held that a taxpayer convicted of willfully filing a false return under section 7206(1) was thereby collaterally estopped from denying, in a subsequent civil tax proceeding pertaining to the same taxable year, that the taxpayer had committed fraud. We further stated that "Of course a conviction for willful falsification, under section 7206(1), while not dispositive, will be one of the facts to be considered in a trial on the merits." Wright v. Commissioner, 84 T.C. at 643-644. For purposes of applying the doctrine of collateral estoppel, there is no difference between a conviction based on a guilty plea, as in the instant case, and a conviction after a trial on the merits. Plunkett v. Commissioner, 465 F.2d at 305-306; Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68, 75 (1964). *500 [21] *501 Collateral estoppel is used to foreclose a party from relitigating an issue that the party previously litigated unsuccessfully in a different action. Meier v. Commissioner, 91 T.C. 273, 283 (1988), on appeal (CADC Jan. 24, 1989). Collateral estoppel may be used in connection with matters of law, matters of fact, and mixed matters of fact and law. Meier v. Commissioner, 91 T.C. at 283. See Montana v. United States, 440 U.S. 147 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979). Collateral estoppel applies to both "evidentiary facts" and "ultimate facts". Meier v. Commissioner, 91 T.C. at 236. [22] *502 In applying collateral estoppel, we have used the following three-prong test ( Meier v. Commissioner , 91 T.C. at 283): First, whether the issues presented in the subsequent litigation are in substance the same as those in the first case; second, whether controlling facts or legal principles have changed significantly since the first judgment; and third, whether other special circumstances warrant an exception to the normal rules of preclusion. [Citations omitted.] The first prong of the test deals with the issues decided and necessary to George Junior's conviction in the criminal proceeding. The factual predicate for George Junior's criminal case is identical with part of the factual predicate for the instant civil fraud case, even though the resulting legal and tax consequences may differ. Every significant fact considered in the criminal conviction is in issue in this case. Both the instant case and the criminal case concern whether George Junior omitted adjusted gross income from his tax return, and whether George Junior knew that he was omitting the income. We conclude that the first prong of the collateral estoppel *503 test has been satisfied. The second prong of the test is whether the controlling facts and legal principles have changed significantly since the first action. We conclude that there have not been any such changes. Collateral estoppel in the instant case relates to precisely the same facts, and there has been no change in the legal principles. We conclude that the second prong of the collateral estoppel test has been satisfied. The third prong of the test is whether there are any special circumstances that would warrant an exception to the normal rules of preclusion. George Junior has not presented any such circumstances. He had ample opportunity to litigate these facts in the criminal proceeding. We conclude that the third prong of the collateral estoppel test has been satisfied. In Arctic Ice Cream Co. v. Commissioner, 43 T.C. at 75, we stated as follows: "It is well settled that a plea of guilty means 'guilty as charged in the indictment,' and that such a plea is a conclusive judicial admission of all of the essential elements of the offense which the indictment charges." The essential element of the indictment to which petitioner pled guilty was that he subscribed under penalties *504 of perjury a joint 1974 Federal income tax return which was filed with the Internal Revenue Service, which return he did not believe to be true and correct in that he well knew and believed that his correct adjusted gross income for the year was substantially in excess of the income he reported. We conclude that George Junior is estopped from denying that the amount of adjusted gross income for 1974 was substantially more than the $ 39,469.95 amount petitioners reported on their 1974 tax return, and that George Junior knowingly and willfully omitted that additional income. The only apparent source of this omitted income is George Junior's withdrawals from the Special Account during 1974. If George Junior's 1974 withdrawals from the Special Account were either as conduit for George Senior or as a way for George Senior to make gifts to George Junior, then those withdrawn amounts would not be includable in George Junior's adjusted gross income. Since George Junior is collaterally estopped to deny that he had substantially more 1974 adjusted gross income than petitioners reported on their 1974 tax return, George Junior is collaterally estopped from persuading us that all of the withdrawals *505 from the Special Account constituted either conduit transactions or gifts. [23] (George Junior is not collaterally estopped from showing that some of the withdrawals constituted conduit transactions or gifts, but on the fraud issue respondent wins if there is any underpayment due to fraud.) Accordingly, we conclude that George Junior omitted substantial income in the form of compensation for 1974 which he knowingly failed to report on his 1974 income tax return. Petitioners have not claimed that the omission of adjusted gross income did not produce an underpayment for 1974 (e.g., because of deductions or credits which they failed to claim on their tax return). On the basis of the *506 record, we conclude that the omission of adjusted gross income produced an underpayment of tax for 1974. The next question is whether any part of this underpayment that respondent has proven was due to George Junior's fraud. Petitioners are collaterally estopped to deny that, when George Junior filed petitioners' 1974 tax return, he "well knew and believed" that petitioners' adjusted gross income for 1974 "was substantially greater" than the amount shown on their 1974 tax return. We had ample opportunity to observe George Junior at the trial in the instant case. Of the nine witnesses, George Junior's testimony was the longest, occupying about 40 percent of the transcript of testimony. On the basis of our observations and George Junior's testimony, we conclude that he had the intelligence and understanding to know that additional income (especially compensation income) should be reported on his tax return and, if reported, would increase his tax liability. From this we conclude that, when George Junior omitted a substantial amount of his compensation income from his 1974 tax return, George Junior was defrauding the Federal government. We conclude that, although the evidence as to *507 1973 appears to be equivocal, the evidence as to 1974 is clear and convincing that (1) there is an underpayment and (2) some part of that underpayment is due to George Junior's fraud. Petitioners contend that, when George Junior pleaded guilty to violating section 7206(1) for 1974, he understood that he was admitting that he omitted from adjusted gross income only the $ 15,700 that had been deposited into his personal account (see table 5, supra). Petitioners contend that George Junior did not plead guilty to omitting the $ 67,230 that he cashed (table 4, supra) or, presumably, the $ 389.83 that was used to pay his creditors (table 6, supra). The indictment to which George Junior pled guilty charged him with knowledge that his adjusted gross income "was substantially greater" than the $ 39,469.95 which petitioners had reported on their 1974 tax return. We accept petitioners' contention that George Junior was thereby conceding only the $ 15,700. For purposes of this issue (and also Issue 2, infra), it is not necessary for respondent to prove that more than $ 15,700 was willfully omitted. Our analysis applies equally to this omission as it would to an omission of some $ 83,000. Thus, *508 even if respondent has proven only that $ 15,700 was willfully omitted, and that petitioners' 1974 tax liability was understated by only the tax attributable to the additional $ 15,700 income, then respondent still has proven enough to (1) overcome the bar of the statute of limitations as to 1974 and (2) impose the fraud addition to tax as to 1974. We hold for petitioners that assessment is barred as to 1973; we hold for respondent that assessment is not barred as to 1974. II. Fraud Addition to Tax
We have held that the statute of limitations bars assessment of any deficiency or additions to tax for 1973, but does not bar such assessment for 1974. In order to impose the fraud addition to tax (sec. 6653(b)) [24] *509 on George Junior as to 1974, respondent must prove, by clear and convincing evidence, that petitioners have an underpayment of tax for that year, and that some part of that underpayment is due to fraud. Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried his burden of proof on the fraud addition to tax issue as to 1974. We hold for respondent on this issue as to 1974. III. Amount of Deficiency
On the fraud issue, respondent had the burden of proof but it was not necessary for him to prove the amount of petitioners' understatement of income, or income tax deficiency. Consequently, it was not necessary for us to determine, for purposes of the fraud issue, the specific amount of petitioners' understatement. On the other hand, in determining the amount of petitioners' deficiency for 1974, we note that generally the burden *510 of proof is on petitioners to show that respondent's determinations are excessive. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). We accept the evidence that George Senior made gifts to George Junior. However, there is no persuasive evidence that any such gifts were included in the Special Account withdrawals charged to George Junior (as distinguished from Special Account withdrawals by George Senior or gifts by George Senior out of other sources). Thus there is no basis for invoking the "Cohan rule" ( Cohan v. Commissioner, 39 F.2d 540 (CA2 1930)) on the asserted gift element of the instant case. We accept the evidence that George Junior cashed checks on the Special Account and gave the proceeds to George Senior. However, we do not accept that George Junior did so on the same days that George Senior also cashed checks on the Special Account, or that George Junior stored up thousands of dollars in a torn jacket for weeks at a time, waiting for George Senior to return from Florida. Also, there is no evidence as to which checks were cashed for that purpose in 1974. Also, there is no evidence as to how frequently George Junior cashed checks for that purpose in 1974. Under *511 these circumstances, we are left with the following: (1) aided by the collateral estoppel effect of George Junior's guilty plea, respondent's determination is largely correct; (2) petitioners have persuaded us that, to some extent, respondent's determination is excessive; and (3) George Junior should have kept records to rebut the reasonable suspicions that led to respondent's determinations. Doing the best we can with an inadequate record on this point, and "bearing heavily * * * upon the taxpayer whose inexactitude is of his own making" ( Cohan v. Commissioner, 39 F.2d at 544; see also Helvering v. Taylor, 293 U.S. 507, 514-515 (1935), to the effect that where a taxpayer has carried the burden of showing that respondent's determination is excessive, then respondent's determination will not be upheld in its entirety even though the taxpayer has not shown the correct amount of the tax liability), we conclude that $ 5,000 of the Special Account checks that George Junior cashed are not taxable to him because, as to that amount, he was merely a conduit for George Senior. We hold for respondent on this issue, except for the aforesaid $ 5,000. [25] *512 *513 To take account of the foregoing and a concession by respondent, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section, chapter, and subtitle references are to sections, chapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
2. The determinations as to 1973 are against petitioner George H. Miller, Jr., and not against petitioner Mary P. Miller. As to 1974, respondent conceded in the notice of deficiency that petitioner Mary P. Miller has no liability for the addition to tax under section 6653(b); on opening brief, he further conceded that petitioner Mary P. Miller qualifies for innocent spouse relief under section 6013(e) and is not liable for the deficiency determined for 1974. Thus, petitioner Mary P. Miller no longer has an ongoing dispute with respondent in the instant case. However, she figures to some extent in the narrative and technically remains a party. See DeLucia v. Commissioner, 87 T.C. 804↩ (1986).
3. The medical expense adjustments are derivative and depend on the resolution of the issues for decision.↩
4. So stipulated. The stipulated exhibits, discussed infra, are described as showing all the sources for deposits into the Special Account. These exhibits account for only about $ 825,000. Respondent has not attempted to account for the discrepancy of more than $ 75,000 between the stipulated total and the stipulated components of that total. Petitioners suggest on brief that George Senior "made deposits of a personal nature" into the Special Account. The evidence in the record does not bear persuasively, one way or another, on this attempted explanation. Since it does not appear that the other $ 75,000 would be likely to affect petitioners' liabilities, we have made our findings in accordance with the parties' stipulations and content ourselves with noting this apparent discrepancy as another "loose end" in the instant case.
5. The transcript includes numerous references to the Miller Company's income tax returns. Since the parties have stipulated that George Senior operated the Miller Company as a sole proprietorship, we assume that the references are intended to be to the Schedules C to George Senior's income tax returns.
6. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
7. Section 6501 provides, in pertinent part, as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed. -- (1) Early return -- For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.
8. On brief, respondent contends that the exception under section 6501(c)(2) also applies. However, that exception, by its terms, does not apply to a "tax imposed by subtitle A or B". The instant case involves only chapter 1 income tax, a tax imposed by subtitle A. It is apparent, then, that section 6501(c)(2) does not apply to the instant case. Accordingly, we do not consider the extent to which the section 6501(c)(2) standard of "willful attempt in any manner to defeat or evade tax" may differ from the section 6501(c)(1)↩ standard of "false or fraudulent return with the intent to evade tax".
9. No consents to extend the statute of limitations were ever executed with respect to George Junior's 1973 income tax or petitioners' 1974 income tax. (Sec. 6501(c)(4).) The notices of deficiency were issued more than 6 years after the tax returns for 1973 and 1974 were filed. (Sec. 6501(e)↩.)
10. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(c) Exceptions. -- (1) False return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
11. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. [This language reflects amendments in 1976 which have no effect on the instant case.] ↩
12. T.C. Memo. 1970-274↩.
13. In that part of his opening brief analyzing the fraud addition to tax, respondent first notes that he has to show that there is an underpayment and then states that he "relies on the discussion contained in Arguments I and II with respect to the underpayment." Argument I of respondent's brief is devoted to a discussion of the presumption of correctness accorded to respondent's determinations, and petitioners' asserted failure to overcome that presumption. The presumption of correctness that attaches to respondent's determinations as to matters of fact in the notice of deficiency does not play any part in the issue of fraud. As we stated in Hebrank v. Commissioner, 81 T.C. 640, 642 (1983), affd. by unreported order (CA11 1985) -- Respondent bears the burden of proof and must show clear and convincing evidence of each element of fraud. * * * The elements to be shown are (1) an underpayment of tax, and (2) that some part of this underpayment was due to fraud. * * * [Emphasis added.] To the same effect, see Petzoldt v. Commissioner, 92 T.C. 661, 699↩ (1989).
14. T.C. Memo. 1970-144; T.C. Memo. 1970-37↩.
15. T.C. Memo. 1966-81↩.
16. See Estate of Fusz v. Commissioner, 46 T.C. 214, 215↩ n.2 (1966).
17. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle [subtitle A, relating to income taxes], gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services including fees, commissions, and similar items: [The subsequent amendment of this provision by sec. 531(c) of the Deficit Reduction Act of 1984 (Pub. L. 98-369, 98 Stat. 494, 884) does not affect the instant case.] ↩
18. T.C. Memo. 1986-275↩. 19. SEC. 102. GIFTS AND INHERITANCES. (a) General Rule. -- Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.↩
20. "The sins of the father are to be laid upon the children". William Shakespeare, Merchant of Venice III. v. 1-2.↩
21. It should be noted that collateral estoppel applies differently depending on whether the first case is a criminal case or a civil case. If the first case is a civil case, then there is no collateral estoppel with regard to a matter that was stipulated ( United States v. International Building Co., 345 U.S. 502, 505 (1953); CSX Corp. v. Commissioner, 89 T.C. 134, 163-164 (1987)) or conceded ( Coors v. Commissioner, 60 T.C. 368, 389-392 (1973), affd. 519 F.2d 1280, 1283 (CA10 1975)). On the other hand, as we have noted, if the first case is a criminal case, then a concession (at least by way of a guilty plea) does have collateral estoppel effect. See discussion in Gray v. Commissioner, 708 F.2d 243, 247 (CA6 1983) (Merritt, J., dissenting), affg. T.C. Memo. 1981-1↩. 22. The trial in the instant case took place after publication of our opinion in Wright v. Commissioner, 84 T.C. 636 (1985), and before our opinion in Meier v. Commissioner, 91 T.C. 273 (1988), on appeal (CADC Jan. 24, 1989). The Court overruled respondent's objections to questions asked of George Junior with regard to George Junior's reasons for pleading guilty to violating section 7206(1) for 1974. This was based on the understanding that, after our opinion in Wright, it was not clear whether The Evergreens v. Nunan, 141 F.2d 927 (CA2 1944), affg. 47 B.T.A. 815 (1942), continued to govern our application of collateral estoppel insofar as that opinion held that collateral estoppel applies only as to matters that are ultimate facts in the second case (i.e., the instant case). In Meier v. Commissioner, 91 T.C. at 236, we held that we would no longer follow The Evergreens on that point. As a result, notwithstanding our ruling at trial, since respondent did timely and correctly object, we have applied collateral estoppel to the extent required by our Meier↩ opinion.
23. Our conclusion, that collateral estoppel applies, results in our accepting the matter determined in the earlier case whether or not we would have reached the same conclusion in that earlier case. As we put it in The Evergreens v. Commissioner, 47 B.T.A. at 825 -- We are not required in that connection to reexamine it [the matter determined in the earlier case] for, if necessary, that [earlier] "decision makes white black; black, white; the crooked, straight; the straight, crooked." Bouvier, Law Dictionary.↩
24. Section 6653(b) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. [The subsequent amendments of this provision (by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 616) and by sec. 1503(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742)) do not apply to the instant case.]↩
25. Respondent's agent, who prepared the report that was followed in the notices of deficiency to petitioners and to George Senior and his wife, testified that respondent took a whipsaw position. That is, all the net deposits to the Special Account were charged as income to George Senior, the owner of the business, and all the withdrawals by or on behalf of George Junior were charged as income to George Junior. If the withdrawals were compensation to George Junior for services he rendered, and were reasonable in amount, then it would appear that George Senior would be entitled to business expense deductions. No such deductions were allowed to George Senior. We note that (1) George Senior did not contest the determinations in the notice of deficiency sent to him, (2) the amounts were assessed, and (3) nevertheless, no payments have been made on account of the assessments. George Senior's wife did contest the determinations, but she was held not liable because of respondent's concession of her claim to relief under section 6013(e). Thus, although respondent took inconsistent positions in the notices of deficiency, respondent's victory as to 1974 in the instant case does not result in inconsistent judgments (or decisions) and respondent is not collecting two taxes on the same items.