T.C. Memo. 2009-222

UNITED STATES TAX COURT

JAMES L. TARPO AND MARLA J. TARPO, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10338-03, 10303-04,     Filed September 24, 2009.
                12819-04.

James L. and Marla J. Tarpo, pro sese.

<u>Kevin Coy</u> and <u>Sherri Wilder</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  James and Marla Tarpo wanted to protect as
much of their income from taxation as they could.  There's
nothing wrong with that if done legally, but the Tarpos fell in

_____

[1] Cases of the following petitioners are consolidated
herewith:  James L. Tarpo and Marla J. Tarpo, docket No. 10303-
04, and Paderborn Trust, Marla J. Tarpo, Trustee, docket No.
12819-04.

with a specialist in abusive tax shelters.  Following his advice, they put James's business into a trust, manufactured spurious deductions, and misreported large amounts of capital gains as capital losses--when they reported the transactions at all.

We wade through the available records to determine what the Tarpos owe and whether they should be penalized.

FINDINGS OF FACT

The Tarpos were a dual-income family during the years at issue--1999, 2000, and 2001.  Most of their income came from James, a computer programmer who contracted his services to corporations in the name of his sole proprietorship, ATE Services.  Although he had several clients during 1999-2001, he worked mostly for a corporation named MaxSys.  MaxSys and most of James's other clients paid their invoices with checks made out to ATE Services.  Marla Tarpo was an independent beauty consultant whose primary financial contribution during those years was the deductions in excess of income she reported on their joint tax return from her own unnamed sole proprietorship.

James Mattatall became a part of the Tarpos' life when a friend recommended his services, perhaps as early as 1997.  Mattatall, as the Tarpos admitted they knew, is neither an attorney nor an accountant.  He earned his living by setting up tax shelters for his clients.  He is now out of that business: In 2004, the U.S. District Court in Los Angeles enjoined him from

organizing, selling, or recommending tax shelters; or even from offering tax advice to clients.  United States v. Mattatall, No. CV 03-07016 DDP (PJWx) (C.D. Cal., Aug. 17, 2004)  (order granting plaintiff's motion for contempt and second amended injunction).  Back in 1999, Mattatall recommended that the Tarpos create an elaborate scheme to route James's ordinary income into a trust, move it offshore, and then retrieve it with credit cards.

Here's how it was supposed to work:

- The Tarpos would create a "business trust," naming Mattatall as the trustee and the Tarpos as managers.  The Tarpos would get a separate mailing address for the trust to lend it credibility.

- James would then transfer ATE Services into the trust, thereby removing himself as the sole owner of his business and assigning all of the income earned from his business to the trust.

- The trust would give a portion of the income James earned back to him as wages.

- The stated beneficiary of the trust would be Prosper International, Ltd. (PIL),[2] an offshore company specializing in multilevel marketing schemes and low-cost foreign grantor trusts.  Any money the trust didn't give back to James would go to PIL and be deposited in a

---

[2] The principals of PIL, Pierre J. Gauthier and Jean Jay Gauthier, a.k.a. Earl L. Savoy, have agreed to a permanent injunction barring them from offering tax shelters.  United States v. Gauthier, No. 6:05-cv-1431-Orl-I8JGG (M.D. Fla., Apr. 3, 2006) (stipulated final judgment of permanent injunction).

foreign grantor trust established for
the benefit of the Tarpos.

- PIL would then give the Tarpos a credit
card that they could use, with the bills
paid from the money in the foreign
grantor trust.

In July 1999, the Tarpos created Paderborn Trust[3] with PIL
as its sole beneficiary, and shortly thereafter leased a post
office box at a Mailboxes, Etc. to be Paderborn's address.[4] They
also "transferred" ATE Services to Paderborn by getting an
employer identification number (EIN) for ATE Services and having
Paderborn claim income reported under that EIN on a Schedule C
attached to its tax return.[5] They then paid $2,000 to PIL to get
a Freedom Card (also known as a Horizon MasterCard), and a PIL
Plus Quick Start Trust (PIL Trust), which was an offshore trust
specifically designed to eliminate income taxes. For an

---

[3] No trust documents were actually offered into evidence, so
it is not clear what the terms of the trust were. We find that
Mattatall was named trustee and the Tarpos were named comanagers
of the trust, because we do have documents that they signed using
those titles. James claimed, however, that he never received a
copy of any documents and didn't know what his duties as manager,
or what Mattatall's duties as trustee, were.

[4] The Tarpos used this address only in official government
documents; at all other times they used their home as the mailing
address for both Paderborn and ATE Services.

[5] Toward the end of 1999 James contacted most of the
corporations that used his services and asked that they report
all his future income, as well as his income for 1999, to the new
EIN.

additional $200, PIL even provided the Tarpos with a foreign grantor for their foreign trust.

James received compensation from Paderborn, and any money that he didn't immediately get from Paderborn went into the PIL Trust.  The Horizon MasterCard directly linked to the Trust, and the Trust used money deposited by Paderborn to pay the Tarpos' Horizon credit-card debt each month.  The Tarpos were free to use the Horizon card however they wanted and only received an expense summary, never a bill.

The plan had one large hitch at the start.  The Tarpos, unable to get a separate bank account set up for Paderborn until 2000, decided instead to deposit checks payable to ATE Services into their personal bank account just as they'd always done.  One big exception was the checks from MaxSys, which the Tarpos cashed, depositing most of that cash into their personal account but keeping the rest.[6]  Once they set up the Paderborn bank account, they began depositing all checks made out to ATE Services into it, though on at least one occasion Marla withdrew money from that account to pay the Tarpos' personal debts directly.  Some money also sloshed between the Tarpos' Paderborn bank accounts over half a dozen times for no reason that we could discern.

---

[6] Neither the Commissioner nor the Tarpos ever established exactly what was done with the cash they kept.

Another of the Tarpos' big mistakes was the way that they reported their income and deductions. Each year, James prepared a Schedule C listing the income paid back to him from Paderborn, but he didn't list Paderborn anywhere on the form. Instead, he indicated that the money came through his own sole proprietorship, ATE Services, just as he always had. Both James and Marla also claimed extensive business deductions--without any records to substantiate them--which brought their taxable income down to almost nothing. They used the same tactic on Paderborn's tax return--again, without any substantiation--only there any remaining income was claimed as an income-distribution deduction[7] so that there was no taxable income.[8]

James was also a very active day trader during these years, often buying and selling stocks hundreds of times per week. He did not keep any records of his bases in these stocks or his net gains and losses, and in fact he didn't even report these

---

[7] A trust is generally allowed to deduct taxable income distributed to its beneficiaries. See secs. 651, 661. This income-distribution deduction implements the he-who-gets-the-income-pays-the-tax principle. If a trust keeps income, the trust is supposed to pay tax on it. But if a trust distributes income, the beneficiary is supposed to pay the tax. (Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.)

[8] Paderborn's taxable income was actually negative $300 each year because the Tarpos claimed a $300 exemption for the trust pursuant to section 642(b), the provision allowing a trust which distributes all of its income a "personal exemption" of $300 yearly.

transactions on his 1999 and 2000 tax returns until he submitted amended returns in February 2003.[9] The Commissioner has conceded that the Tarpos are entitled to a $3,000 capital loss deduction for both 2000 and 2001. A major question is how much in capital gains or losses they had at the end of 1999.

Our finding on James's 1999 capital gains or losses has two parts--the loss carryforward and sale proceeds. Neither James nor the Commissioner was able to provide a precise accounting of the Tarpos' capital gains or losses for 1999, so we pieced together the information from what was in the record. James's 1999 amended return included a $34,794 short-term capital loss carryforward, but he offered no substantiation for it at trial. A taxpayer's returns alone do not substantiate deductions or losses because they are nothing more than a statement of his claims. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974). To hold otherwise would undermine our presumption that the Commissioner's determination is correct. See Rule 142; Halle v. Commissioner, 7 T.C. 245, 247 (1946), affd. 175 F.2d 500 (2d Cir. 1949). We therefore find that James had no short-term capital loss carryforward to apply to his 1999 short-term capital gains.

---

[9] We treat any income reported on the actual and amended returns as admissions by the Tarpos.

We next turn to figuring out the sale proceeds from James's day trading in 1999. The Commissioner subpoenaed E*Trade Financial Corporation and obtained Forms 1099 listing all of James's trades in 1999. We entered the trades into a spreadsheet and calculated the gain or loss for each company he invested in and found the aggregate gain to be $91,709. The table below shows the gain or loss for each company.[10] James closed out his position in most of the companies by the end of 1999, but he still held shares in the italicized companies at the end of the year. Since we could not match the shares that were sold with their respective purchase date for such companies, we applied the so-called "FIFO Rule," where the basis in the first lot or share that needs to be identified, on account of a sale, equals the basis of the earliest of those lots purchased. See sec. 1.1012-1(c), Income Tax Regs.

| Company | Sale Price | Basis | Gain/(Loss) |
|---|---|---|---|
| At Home | $27,204.14 | $25,671.15 | $1,532.99 |
| Advanced Fibre | 11,553.46 | 12,096.15 | (542.69) |
| Amazon | 387,918.52 | 386,840.35 | 1,078.17 |
| Applied Mic | 15,154.54 | 13,194.95 | 1,959.59 |

---

[10] For shares of stock for which we had no purchase information (other than unsubstantiated estimates), we set the basis at zero. (The taxpayer bears the burden of showing he is not liable for tax on all the proceeds received, and if he fails to do so, we treat the full amount as taxable gain. Rockwell v. Commissioner, 512 F.2d 882, 886-87 (9th Cir. 1975), affg. T.C. Memo. 1972-133; Golub v. Commissioner, T.C. Memo. 1999-288.)

| Company | Sale Price | Basis | Gain/(Loss) |
|---|---|---|---|
| Conexant Systems | $95,655.69 | $89,606.00 | $6,049.69 |
| Cyberian Outpost | 145,361.71 | 144,499.60 | 862.11 |
| *E*Trade* | 368,554.48 | 355,703.58 | 12,850.90 |
| Earthlink Network | 41,808.70 | 43,314.90 | (1,506.20) |
| Equity Residential | 21,354.33 | 0.00 | 21,354.33 |
| *IKOS Systems* | 19,979.38 | 16,727.40 | 3251.98 |
| KN Energy Peps | 35,133.92 | 0.00 | 35,133.92 |
| *Netsilicon* | 20,545.70 | 17,977.40 | 2568.30 |
| Purchasepro | 33,795.26 | 38,559.85 | (4,764.59) |
| RealNetworks | 281,266.28 | 281,935.30 | (669.02) |
| Sharper Image | 16,729.49 | 11,207.45 | 5,522.04 |
| Sportsline.com | 16,459.54 | 17,364.90 | (905.36) |
| Track Data | 586.27 | 707.45 | (121.18) |
| Uroquest Medical | 2,266.50 | 0.00 | 2,266.50 |
| VISX Delaware | 96,743.15 | 90,956.00 | 5,787.15 |
| **TOTAL** | **1,638,071.06** | **1,546,362.43** | **91,708.63** |

In 2002, the Commissioner chose the Tarpos' 1999 return for audit. The Tarpos showed up with Mattatall, but didn't bring any of the requested documentation and didn't answer any questions. Instead, they simply handed the examiner affidavits attesting to the truth of the items claimed on their tax returns. They also brought amended tax returns for 1999 and 2000 which included

previously unreported stock transactions as well as unreported dividends and interest.

In an effort to get some documentation other than the affidavits, the examiner set up another meeting. This time, Marla showed up alone with a box full of disorganized receipts. She again refused to answer any questions, so the examiner subpoenaed records from the Tarpos' banks, their brokers, and the companies that had used James's services. The Commissioner finally sent a notice of deficiency for 1999 in April 2003. It was signed by an IRS employee with the title Technical Services Territory Manager.

The Tarpos' conduct during the audit of their 1999 return sparked an audit of their 2000 and 2001 returns, which the Commissioner quickly extended to Paderborn's returns for those years. The Tarpos did not respond to any of the examiner's requests for information, and more third-party summonses followed.

In the notices of deficiency, the Commissioner disallowed all of the Tarpos' claimed deductions and set up a whipsaw position, attributing the same income to both Paderborn and the Tarpos. The notices of deficiency for the 2000 and 2001 tax years of both the Tarpos and Paderborn were also signed by the same IRS employee.

The Tarpos timely petitioned us for review of all three notices. The cases were tried together in Los Angeles, where the Tarpos resided when they filed their cases.

OPINION

I. Jurisdiction

The Tarpos open with a frivolous jurisdictional argument. They claim that the notices of deficiency are invalid because a "Technical Services Territory Manager" is not authorized to issue them. Statutory notices of deficiency are valid only if issued by the Secretary of the Treasury or his delegate. Kellogg v. Commissioner, 88 T.C. 167, 172 (1987); see also secs. 6212(a), 7701(a)(11)(B), (12)(A)(i). The Technical Services Territory Manager position is part of the Small Business/Self-Employed (SB/SE) division of the IRS. SB/SE Territory Managers were specifically delegated the authority to send notices of deficiency in Delegation Order No. 77 (Rev. 28), 61 Fed. Reg. 30937 (June 18, 1996) (effective May 17, 1996). That delegated authority was re-authorized in Delegation Order 4-8, Internal Revenue Manual pt. 1.2.43.2 (Feb. 10, 2004). There is no question that the IRS employee who signed the notices of deficiency had the authority to do so. We therefore hold that we have jurisdiction.

II.  Validity of Paderborn Trust

The Commissioner views Paderborn as a fat target, and fires three weapons at it: arguments that Paderborn is a sham trust, that it is a grantor trust, and that Tarpo was just assigning his income to it.  We begin by describing how Paderborn worked.

A.  Operation of Paderborn

The purpose of the Paderborn/PIL Trust/Horizon MasterCard arrangement was to reduce or eliminate income taxes.  By transferring ATE Services to Paderborn and calling James an independent contractor of ATE Services rather than its sole proprietor, James claims he could be paid a fixed amount which he could then offset with unreimbursed Schedule C expenses.  Paderborn deducted what it paid to James as "contracted development."  Everything that remained in Paderborn at the end of the year was transferred to the PIL Trust, shipped from the United States, and placed in the hands of foreigners not subject to the Code.  By using the Horizon MasterCard, which was paid directly by the PIL Trust, the Tarpos could access the money without repatriating it.

On paper, most of the earned income was reported somewhere. The money which would have been reported on James's Schedule C before the trusts were established was instead reported for 1999-2001 as follows:

## 1999



Expenses & deductions of $3,625[1]

## 2000



## 2001[2]

---

[1] The trust claimed a $300 exemption, which made its reported taxable income -$300.

[2] The 2001 Paderborn tax return wasn't admitted into evidence (we have only an electronic summary), so we don't know why there is a nearly $1000 difference between the amount paid to ATE/Paderborn and the amount paid out from Paderborn. We are also unsure why the checks admitted into evidence show more income flowing from MaxSys to ATE than its Form 1099 did for 2001.

---

Since Paderborn had no separate bank account in 1999, everything that was designated as going to Paderborn was actually cashed by the Tarpos and deposited in their personal checking account. For the other years, anything noted as paid to Paderborn was actually deposited in Paderborn's checking account. Whenever PIL received money, it deposited that money into the PIL Trust.

B.   Improper Income Assignment

A basic income tax principle is that a taxpayer is taxed on the income that he earns, and that income cannot be assigned to another. Commissioner v. Banks, 543 U.S. 426, 433-34 (2005); Lucas v. Earl, 281 U.S. 111, 114-15 (1930). When a taxpayer tries to assign the right to future income to another person, the IRS and courts ignore the attempt for tax purposes; the assignor pays all the taxes he would have paid had he not assigned the income. Banks, 543 U.S. at 433-34; see also Burnet v. Leininger, 285 U.S. 136 (1932) (can't escape tax on profits by assigning them); Wesenberg v. Commissioner, 69 T.C. 1005, 1010-11 (1978) (conveyance of earned income ineffective when taxpayer retains "ultimate direction and control over the earning of the compensation").

Transferring ATE Services to Paderborn didn't actually change anything other than which taxpayer identification number the income was reported under. James still did all the business

development, performed all the work, and signed all the timesheets. He was still the one earning the income, and it never left his control. At one point during the trial, James testified that he was assigning his income to Paderborn:

> COURT: Okay. So what you were doing then, if I can understand this right, is you would go to a company like MACSIS [sic] or N.H. Services, you would contract with them, and then the idea was for you to assign the income to the Paderborn Trust?
>
> JAMES TARPO: Right.

It doesn't get much simpler than that.

We therefore find that the Tarpos improperly assigned James's earned income to Paderborn. We must disregard Paderborn, and will treat James as ATE Services' sole proprietor.

C. Grantor Trust

The Commissioner also argues that Paderborn and PIL were grantor trusts. A grantor trust is created when a person contributes cash or property to a trust, but continues to be treated as owner of it at least in part. See secs. 671-679. The Code tells us to disregard such a trust as a separate taxable entity to the extent of the grantor's retained interest. Sec. 671; sec. 1.671-2(b), Income Tax Regs. And the grantor of a grantor trust is supposed to report his portion of the trust's income and deductions on his own tax return, not the trust's.

We find that the Tarpos retained ownership of all of the assets in Paderborn and the PIL Trust. Sections 674, 676, 677,

and 679[11] state that the grantor will be treated as the owner of a trust when he keeps certain powers or takes certain actions. Here's a summary of what the Tarpos did that makes their trusts grantor trusts:

- A grantor may dispose of the trust's income without the approval or consent of an adverse party. Sec. 674(a). The Tarpos had unfettered access to all of Paderborn's assets as comanagers with signatory authority on the Paderborn bank account.

- A grantor can revest title over the property in himself. Sec. 676(a). The Tarpos could revest title of Paderborn assets in themselves at any time; Marla proved this when she purchased a cashier's check payable to James's broker, Computer Clearing Services, to pay off personal debt.

- A grantor trust's income can be distributed or accumulated for future distribution to the grantor or the grantor's spouse. Sec. 677(a). All of the money paid into Paderborn was paid back out to either the Tarpos directly or to PIL, which then distributed the money to the Tarpos via the Horizon card.

- The grantor directly or indirectly transfers property to a foreign trust. Sec. 679(a). The Tarpos transferred property directly to a foreign trust when they set up the PIL Trust, and they transferred property indirectly to the same trust every time Paderborn sent it money.

---

[11] Each of these sections lists exceptions, but none of those exceptions applies in this case.

We therefore find in the alternative that Paderborn and the PIL Trust should be disregarded for income tax purposes as nothing more than grantor trusts.[12]

III. Income and Deductions

Having decided that all Paderborn's income properly belongs to the Tarpos, we turn to figuring out what that income was. We then discuss the deductions claimed by both James and Marla on their respective Schedules C that might reduce the portion of that income that is taxable.

A. Income for 1999, 2000, and 2001

The Commissioner did not contest Marla's reported income for any of the years at issue, so we go straight to the question of what income James should have reported on his Schedule C. Since the Tarpos did not produce any records during the audit, the Commissioner relied on bank statements. Through these statements, he discovered the names of the companies that paid James for his services, and was able to find out exactly how much they paid ATE Services each year. From there, the Commissioner was able to compare the bank statements for the Tarpos, ATE Services, and Paderborn to determine where the money was going and how much the Tarpos were actually making. Summarizing the

_____

[12] As we said at the beginning of this section, the Commissioner had a third theory--that the trusts were shams--but we won't pile on.

information in tabular form shows how much each client paid

James:

<u>1999</u>

| CLIENT | AMOUNT |
|---|---|
| Alcon Laboratories, Inc. | $8,840 |
| Winsoft Inc. | 5,400 |
| USANA, Inc. | 988 |
| N.H. Resources, Inc. | 15,115 |
| MaxSys Technologies | 21,710 |
| **Total** | **52,053** |

<u>2000</u>

| CLIENT | AMOUNT |
|---|---|
| MaxSys Technologies | $110,663 |
| **Total** | **110,663** |

<u>2001</u>

| CLIENT | AMOUNT |
|---|---|
| MaxSys Technologies | $87,141 |
| Vektrek Electronic Sys | 375 |
| **Total** | **87,516** |

By using these methods, the Commissioner determined that the

Tarpos had gross income which should have been reported on

James's Schedule C as follows:

| 1999 | 2000 | 2001 |
|---|---|---|
| $52,053 | $110,663 | $87,516 |

We agree with the Commissioner and find that these totals are accurate.[13]

B.   Deductions for 1999, 2000, and 2001

Expenses are allowable if they are "ordinary and necessary," but a taxpayer must keep records to show the connection between the expenses and his business.  Sec. 162(a); Gorman v. Commissioner, T.C. Memo. 1986-344; sec. 1.6001-1(a), Income Tax Regs.  If the taxpayer has no records, but we find he must have incurred some expenses, we can estimate the amounts of those expenses as long as there is something in the record to support the estimate (the Cohan rule).  Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930).  The Cohan rule does not apply to expenses that the Code lists in section 274(d); taxpayers have to meet special substantiation requirements for these listed expenses.  Sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985); Sanford v. Commissioner, 50 T.C. 823, 827-28 (1968), affd. 412 F.2d 201 (2d Cir. 1969).

The Tarpos claim a great many business expenses, including those claimed by Paderborn on its return.  These include expenses we can estimate under the Cohan rule--cost of goods sold, depreciation, interest, supplies, business use of their home,

[13]   To this must be added the capital gains that the Tarpos should have reported on their Schedule D.  See supra pp. 8-9.

cleaning, equipment, gifts, training, sales promotion--as well as section 274(d) items that we can't estimate under Cohan, like car-and-truck expenses, travel, and meals and entertainment. At no point during audit or pretrial discovery did the Tarpos provide any receipts or explanations for any of these items. During the trial itself, Marla didn't testify at all and James never testified about the disputed deductions.

All the Tarpos ever provided were unsupported affidavits swearing to the truth of each item on each tax return. They did this at Mattatall's suggestion, but as other Mattatall clients have discovered, self-serving affidavits are not substantiation. See Doudney v. Commissioner, T.C. Memo. 2005-267; Kolbeck v. Commissioner, T.C. Memo. 2005-253.

Since we have nothing on which to base any Cohan estimate, we hold that all but one of the Schedule C deductions claimed by the Tarpos are disallowed for lack of substantiation either because they are section 274(d) deductions subject to a higher substantiation standard, or because there was no evidence provided from which this Court could make a reasonable estimate of expenses. The one deduction which we will allow as an ordinary and necessary business expense under Cohan is the $108 licensing fee Marla incurred in 2000. We allow this one because we realize that a beauty consultant requires a license to operate and we are convinced that she actually paid the licensing fee.

IV. <u>Penalties</u>

    A.   <u>Fraud Penalty</u>

Section 6663 imposes a penalty equal to 75 percent of the underpayment when that underpayment is attributable to fraud. The Commissioner has the burden of proving fraud, and he has to prove by clear and convincing evidence that the taxpayer underpaid and that the underpayment was attributable to fraud. Sec. 7454(a); Rule 142(b); <u>Miller v. Commissioner</u>, T.C. Memo. 1989-461. If the Commissioner succeeds in proving that even part of the underpayment is due to fraud, then "the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud." Sec. 6663(b).

The Commissioner easily passes the first part of this test. He proved there was an underpayment when he proved that the Tarpos didn't report the additional income they tried to assign to Paderborn.

But was a portion of that underpayment due to fraud? Fraud is the "willful attempt to evade tax," and we make that determination by looking at the entire record of a case. <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). There are many factors which can indicate fraud, including:

- understatement of income

- inadequate records

- concealing assets

- failure to cooperate with tax authorities

- mischaracterizing the source of income

- implausible or inconsistent explanations of behavior.

See Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Meier v. Commissioner, 91 T.C. 273 (1988). Although James Tarpo exhibited each and every one of these factors, the most telling was his attempt to conceal assets offshore with PIL. The only plausible reason he had to set up such a foreign grantor trust, where the sole beneficiary was a company which James knew very little about, was to try to hide assets from the IRS to avoid paying taxes. We therefore find that, at least in respect to the income assigned to Paderborn, the Commissioner has proven fraudulent intent by clear and convincing evidence.

Since a portion of the underpayment is attributable to fraud, all of the underpayment will be subject to the fraud penalty unless the Tarpos can show by a preponderance of the evidence that some of the underpayment was not due to fraud. We find that James has met this burden in regard to the capital gains for 1999. We therefore hold that the underpayment attributable to his understating his capital gains is not subject

to the fraud penalty.  We also find that the Commissioner has met his burden of proof only with regard to James; he has not shown that Marla acted with fraudulent intent--about her intent there was no evidence or argument at all.

James asserts that he had reasonable cause for his return position and that he acted in good faith.  Sec. 6664(c).  He claims that the entire fiasco is Mattatall's fault, and that his good faith reliance on Mattatall reasonably caused him to act the way he did.  While that excuse might work when a licensed and reputable tax professional offers the advice, it doesn't work here.

James never once asked for any credentials from Mattatall, and in fact admitted under oath that he knew Mattatall was neither an attorney nor an accountant.  James also knew that the foreign trust setup was specifically created to hide the true ownership of assets and income from the IRS.  We therefore find that James has not proved a defense to fraud.

B.   Accuracy-related Penalty

Section 6662(a) and (b)(1) and (2) permits the imposition of an accuracy-related penalty equal to 20 percent of the underpayment when that underpayment is due to negligence or a substantial understatement.  Because the Tarpos were negligent in their recordkeeping and showed intentional disregard of the tax rules and regulations even in their reporting of their capital

gains and supposed expenses, we find that the entire underpayment not attributable to fraud is subject to the accuracy-related penalty.

The same defense of reasonable cause and good faith applies to this penalty, see sec. 6664(c), and the Tarpos must show they acted as reasonable and prudent people would, see Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). This, we find, they failed to do. James didn't keep any regular records of his day-trading activities despite knowing that he would owe tax on any capital gains he made. He is business savvy and should have known better. And neither Tarpo claims to have kept any other sort of business records. Reasonable people usually keep records to show their entitlement to deductions or at least to track income and expenses. The Tarpos are either not acting reasonably or are not telling the truth. Either way, they do not have a credible defense to the accuracy-related penalty.

For the above reasons,

Decisions will be entered

under Rule 155.